# In the United States Court of Federal Claims

No. 19-1390

(Filed: March 15, 2024)

```
*****************************
JKB SOLUTIONS AND SERVICES, LLC,   *
                                   *
                    Plaintiff,     *
                                   *
        v.                         *
                                   *
THE UNITED STATES,                 *
                                   *
                    Defendant.     *
*****************************
```

*William A. Lascara*, Pender & Coward, P.C., Virginia Beach, VA, counsel for Plaintiff. With whom was *Bryan S. Peeples*, Pender & Coward, P.C., of counsel.

*Amanda L. Tantum*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant. With whom were *Dana J. Chase*, Contract Litigation & Intellectual Property Division, and *Adam Hill*, U.S. Army Legal Services Agency, of counsel.

## OPINION AND ORDER

**DIETZ, Judge.**

JKB Solutions and Services, LLC ("JKB") brings this suit against the United States under the Contract Disputes Act of 1978, 41 U.S.C. § 7104 ("CDA"), seeking breach of contract damages arising from its Indefinite Delivery Indefinite Quantity ("IDIQ") contract for instructor services with the United States Department of the Army ("Army"). Before the Court are the parties' cross motions for summary judgment on the issue of liability. JKB alleges that the Army breached the contract when it did not allow JKB to perform the instructor services and refused to pay for the services. The government contends that, even if it did breach the contract, the contract contains a termination for convenience clause that allows the breach to be converted into a constructive termination for convenience and limits JKB's recovery to termination costs. As explained below, the Court finds that the contract contains an applicable termination for convenience clause but that genuine issues of material fact preclude summary judgment on whether the Army breached the contract and, if so, whether the Army acted in bad faith or abused its discretion such that constructive termination is not available. Accordingly, JKB's motion for summary judgment is **DENIED**, and the government's cross-motion for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**.

I.      **FACTUAL BACKGROUND**

JKB is "a Virginia limited liability company with its principal place of business in Norfolk, Virginia." Am. Compl. [ECF 65] ¶ 2. JKB is "a contractor with the United States Department of Defense [], providing professional and training services to the United States military." *Id.* To date, JKB has "never contracted with any person or entity other than the Federal government." Decl. of James K. Bailey [ECF 80-1] at 164.[1]

The Army offers courses for "professional military education, civilian education, and joint, multinational, and interagency education supporting America['s] Army logistics leaders of today and tomorrow" at its Army Logistics University ("ALU") located in Fort Lee, Virginia. Am. Solicitation [ECF 65-1] at 77. In support of these courses, the ALU sought "to procure [] Operational Contract Support (OCS) Instructor services." Market Research Memorandum [ECF 81-1] at 4 (internal quotation marks omitted). The OCS course is a 73-hour course developed and managed by the ALU, and it typically spans ten academic days. [ECF 65-1] at 74. In the OCS course:

> [S]tudents learn contractor management; integration of operational contract support requirements into the military decision making process; development of acquisition ready requirements packages, including performance work statements, independent government estimates, letters of justification, and quality assurance surveillance plans; and integration of operational contract support requirements into the unit spend plan process.

*Id.*

To solicit interested contractors and to comply with FAR Part 12 which governs the acquisition of commercial services, the Contracting Officer ("CO") issued a sources sought notice in January 2015. Determination and Findings [ECF 81-1] at 8; *see* Sources Sought Notice [ECF 82-2] at 4. The notice sought "to identify potential businesses that have the skills, experience, knowledge, and capabilities to perform Instructor and Training Support services." [ECF 81-1] at 4. The Army received "18 responses to two (2) sources sought notices." *Id*. at 8.

The CO summarized the responses in the Determination and Findings ("D&F"), stating that "[t]he commercial market was surveyed for commercial standards, practices, and procedures." [ECF 81-1] at 8. The CO cited FAR 2.101's definition of a commercial service, which is "a service of a type offered and sold competitively in substantial quantities in the commercial marketplace based on established catalogue or market prices for specific tasks performed or specific outcomes to be achieved under a standard commercial item condition." *Id.* at 7. Further, the CO explained that "a commercial item is any item . . . that is of a type customarily used by the general public or by non-governmental entities for purposes other than

---

[1] All page numbers refer to the page numbers generated by the CM/ECF system. The Court cites to the appendix attached to JKB's motion as "[ECF 80-1] at __." The Court cites to the appendix attached to the government's cross-motion as "[ECF 81-1] at __" and the appendix attached to the government's response as "[ECF 82-2] at __."

government purposes, and (i) has been sold, leased, or licensed to the general public; or (ii) has been offered for sale, lease, or license to the general public." *Id.* Based on market research and the responses to the sources sought notice, the CO determined that "[i]nstructor services are common both in the military and commercial market," and that "[c]ommercial market applications are vast and range from Red Cross to yoga to National Rifle Association instructors." *Id.* at 8. Therefore, in accordance with FAR 2.101, the CO concluded "that the services are a type of service offered and sold competitively in substantial quantities in the commercial marketplace." *Id.*

On May 29, 2015, the Army issued a small business set aside solicitation for instructor services. [ECF 65-1] at 1, 26. The solicitation contemplated the "award [of] a single Firm Fixed Price (FFP) / Cost Reimbursement (CR) (no fee), [IDIQ] contract." *Id.* at 4. The Army used Standard Form ("SF") 1449, the template for commercial item solicitations, *see* FAR 53.212 (2012),[2] and the solicitation incorporated by reference the commercial items clause, FAR 52.212-4. *See* [ECF 65-1] at 1. JKB did not protest the solicitation terms or the government's method of procurement. *See* Dep. of James K. Bailey [ECF 81-1] at 137. The Army amended the solicitation multiple times, and the sixth (and final) amendment was made on July 15, 2015. [ECF 65-1] at 72.

The solicitation stated that the contractor "shall provide all instructional services to include: 1) Preparation, 2) Classroom Instruction, 3) Student Assessment, 4) Remediation, and 5) Course Administration." [ECF 65-1] at 26. The Executive Summary stated that "the contract will have three (3) one (1) year ordering periods" and "a guaranteed minimum requirement of $15,000." *Id.* at 4. It provided that the estimated contract ceiling is $1,103,311. *Id.* It also stated that "[t]he Government currently projects ordering instructors for an estimated 14 courses for each ordering period." *Id.* The Performance Work Statement ("PWS") further provided that "[t]he objective of this effort is to augment ALU faculty during specified two week periods in support of the ALU training mission." *Id.* at 74. The PWS informed interested offerors that "[t]he Government will provide Contract instructors with all media, courseware and examination materials necessary to deliver the course." *Id.* at 78.

On August 21, 2015, JKB submitted a revised proposal that included a pricing schedule for fourteen classes for each of the three ordering periods. *See* Aug. 21, 2015, E-Mail [ECF 80-1] at 149, 152. The government accepted JKB's Best and Final Offer. [ECF 65] ¶ 13. On September 9, 2015, the government and JKB entered an IDIQ contract, Contract No. W15QKN-15-D-0100 ("the Contract"). Contract [ECF 65-2] at 1, 4. The Contract covered three ordering periods and included separate Contract Line Item Numbers ("CLINs") for each period. *See id.* at 4-11. Further, the CLINs for instructor services—CLINS 1001, 2001, and 3001—were described as "Firm-Fixed-Price." *Id.* The Contract also stated that "[t]he contractor shall . . . provide instructional services [at] Fort Lee, Virginia and at other locations in the continental United States (CONUS) to support a maximum of 14 classes per year." *Id.* at 12. In support of the

---

[2] Citations to the FAR refer to the clauses and provisions in effect at the time the government and JKB entered the Contract on September 9, 2015. *See Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005) ("As an initial matter, we note that the Army regulations in effect at the time of [plaintiff's] discharge . . . , rather than current regulations, guide our analysis.").

fourteen classes, JKB would teach scheduled and unscheduled classes. *See* Dep. of Alicia Toth [ECF 80-1] at 28. The Contract required the government to provide a 14-day notice to JKB of any changes to the curriculum or course schedule. [ECF 65-2] at 12. Like the Solicitation, the Contract incorporated by reference FAR 52.212-4, Contract Terms and Conditions—Commercial Items, which included a clause allowing the government to terminate the Contract for convenience. *See* [ECF 65-2]; FAR 52.212-4(l) (2015). The Contract also included a "Supplemental Information" section, stating that "[t]he contract guaranteed minimum of $15,000 will be fulfilled with the issuance of the first task order." [ECF 65-2] at 4. It provided that the Contract ceiling is $1,072,594. *Id.*

The CO issued Task Order 001 for Ordering Period 1, which lasted from September 9, 2015, to September 8, 2016. Task Order 001 [ECF 65-3] at 1. Task Order 001 ordered one lot of classes on a firm fixed price basis for $297,360. *Id.* at 4. It specified that the price per class was $21,240. JKB taught nine classes during Ordering Period 1, and the Army compensated JKB for the nine classes. [ECF 65] ¶ 53. After Ordering Period 1, the CO issued Task Order 002 for Ordering Period 2, which lasted from September 9, 2016, to September 8, 2017. Task Order 002 [ECF 65-4] at 1. Task Order 002 ordered one lot of classes on a firm fixed price basis for $303,968. *Id.* at 4. It specified that the price per class was $21,712. *Id.* During Ordering Period 2, JKB taught thirteen classes, and the Army compensated JKB for the thirteen classes. [ECF 65] ¶ 85. After Ordering Period 2, the CO issued Task Order 003 for Ordering Period 3, which lasted from September 9, 2017, to September 8, 2018. Task Order 003 [ECF 65-5] at 1. Task Order 003 ordered one lot of classes on a firm fixed price basis for $310,576. *Id.* at 5. It specified that the price per class was $22,184. *Id.* JKB taught eight classes during Ordering Period 3, and the Army compensated JKB for the eight classes. [ECF 65] ¶ 117.

In addition to contracting with JKB, the government maintained its own ALU instructors. *See* Dep. of Anthony D. Hicks [ECF 81-1] at 187. The government instructors who taught the OCS classes did not receive any extra pay for teaching these classes because it was a part of their primary job duties. *See* Dep. of William C. Latham [ECF 80-1] at 102. The government instructors taught seventeen of the twenty-six OCS classes during the first ordering period, Decl. of John P. Wilson [ECF 81-1] at 202, thirteen of the twenty-six OCS classes during the second ordering period, *id.* at 203, and thirteen of the twenty-one OCS classes during the third ordering period, *id.* Several of the classes taught by the government instructors were not taught within CONUS. *Id.* at 202-03.

On April 2, 2018, during Ordering Period 3, James K. Bailey, JKB's President and Owner, emailed the Contracting Officer's Representative ("COR") to explain that it could not provide instructors for certain unscheduled classes. Apr. 2, 2018, E-Mail [ECF 81-1] at 80-81. He stressed "the importance of assigning JKB 'scheduled' classes, as 'unscheduled' [][classes] may or may not occur or JKB instructors may or may not be available." *Id.* He concluded by stating that he "anticipate[d] a 'breach of contract' by the Government for not providing 14 classes for each of the three ordering periods." *Id.* at 81. The following day, JKB sent a letter to Army Contracting Command explaining that the Contract required the Army to provide JKB with fourteen classes per Ordering Period at a firm-fixed price. Apr. 3, 2018, Letter [ECF 65-6] at 3.

4

On June 11, 2018, the Army sent JKB a proposed contract modification for Task Orders 001 and 002, to "de-obligate itself for payment for the five classes which it did not allow JKB to provide in Ordering Period One," and "for payment for the one class which it did not allow JKB to provide in Ordering Period Two." June 11, 2018, E-Mail [ECF 65-7] at 1. On June 25, 2018, JKB informed the CO that JKB was "not in agreement with [the contract modification]." June 25, 2018, Letter [ECF 65-8] at 1. JKB then submitted invoices for five classes under Ordering Period 1 and one class under Ordering Period 2. Sept. 28, 2018, Claim [ECF 65-9] at 1. The Army did not pay these invoices. [ECF 65] ¶¶ 66, 98. On June 28, 2018, JKB and the Army held a conference call during which the Army "proposed de-scoping CLIN 3001 in order to reduce the number of ordered classes." *Id.* ¶ 127. JKB did not agree. *Id.*

On September 28, 2018, JKB sent the CO a claim letter for the contested amounts and requested a Contracting Officer's Final Decision. [ECF 65-9] at 1. The CO did not respond to the claim letter. [ECF 65] ¶¶ 73, 105, 136. JKB subsequently filed the instant suit seeking damages for breach of contract. *See id.* ¶¶ 74, 106, 137. After the Court denied the government's motion to dismiss, *JKB Sols. & Servs. v. United States*, 148 Fed. Cl. 93 (2020), the government moved for summary judgment, arguing that "even assuming that the task orders ordered 14 courses in each of the ordering periods . . . the Army – by not scheduling all 14 courses each ordering period – can only be understood to have constructively terminated the task orders, rather than breaching them." [ECF 31] at 11. Consequently, the government argued that "JKB cannot recover breach damages and is limited to termination for convenience costs." *Id.* at 16. The Court granted the motion, concluding that the Contract "incorporated a termination for convenience clause," that "the Army constructively terminated each task order for convenience," and that "JKB may only recover its termination for convenience costs." *JKB Sols. & Servs. v. United States*, 150 Fed. Cl. 252, 254, 255 (2020).

On appeal, the United States Court of Appeals for the Federal Circuit vacated that decision and remanded the case. *JKB Sols. & Servs. v. United States*, 18 F.4th 704, 711 (Fed. Cir. 2021). The Federal Circuit held that "[t]he Claims Court erred by holding that JKB['s] . . . contract contained an applicable termination for convenience clause" because it relied solely on the Contract's incorporation of 52.212-4 by reference and "FAR 52.212-4 governs the termination of commercial item contracts for the government's convenience, and [] does not apply to service contracts, such as the contract at issue in this case." *Id.* at 710. The Federal Circuit instructed that the Court "may consider [on remand] whether the *Christian* doctrine applies to incorporate a termination for convenience clause and whether, in light of our case law, the doctrine of constructive termination for convenience applies in these circumstances." *Id.* at 711.

Thereafter, JKB filed an amended complaint, re-asserting its claims under the CDA, adding claimed termination costs, and alleging that the CO acted in bad faith and abused her discretion. [ECF 65]. After the government filed its answer to JKB's complaint, [ECF 66], the parties agreed to complete fact discovery on "all issues, including but not limited to issues related to alleged contract breaches and constructive termination for convenience" and to resolve any issues regarding damages in subsequent proceedings, if necessary, [ECF 73] at 2. The parties also agreed to file motions for summary judgment on the liability issues after completing fact

5

discovery. *Id.* The parties filed their cross-motions for summary judgment on October 31, 2022. [ECFs 80, 81]. The Court held oral argument on July 26, 2023. *See* [ECF 86].

## II.     LEGAL STANDARDS

"Summary judgment is appropriate where the evidence demonstrates that there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Agility Def. & Gov't Servs., Inc. v. United States*, 115 Fed. Cl. 247, 250 (2014) (quoting Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC")). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Vanquish Worldwide LLC v. United States*, 147 Fed. Cl. 390, 405 (2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue is genuine if it 'may reasonably be resolved in favor of either party.'" *Id.* (quoting *Anderson*, 477 U.S. at 250). "Where the parties have filed cross-motions for summary judgment, the court evaluates each motion on its own merits and makes all reasonable inferences against the party whose motion is under consideration." *Agility Def.*, 115 Fed. Cl. at 250 (citing *Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968-69 (Fed. Cir. 2009)). The court's function is to "determine whether there is a genuine issue for trial" when making a summary judgment determination. *Cheung v. United States*, 146 Fed. Cl. 369, 372 (2019) (citing *Anderson*, 477 U.S. at 249).

Under RCFC 56, "a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file." *Rice Sys., Inc. v. United States*, 62 Fed. Cl. 608, 618 (2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories, and admissions." *Id.* (citing *Celotex*, 477 U.S. at 324). "[I]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact," the court shall grant summary judgment to the moving party. *Holland v. United States*, 57 Fed. Cl. 540, 560 (2003) (quoting RCFC 56(c)). "The court will deny both motions if, upon the required analysis, a genuine issue of material fact exists." *IMS Engineers-Architects, P.C. v. United States*, 87 Fed. Cl. 541, 550 (2009) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987)).

"Contract interpretation is a question of law, which may be decided on summary judgment." *SSA Marine, Inc. v. United States*, 77 Fed. Cl. 662, 665 (2007) (citing *Hughes Commc'ns Galaxy, Inc. v. United States*, 998 F.2d 953, 957 (Fed. Cir. 1993)). Where the "provisions of the [contract] are phrased in clear and unambiguous language, they must be given their plain and ordinary meaning, and [the court] may not resort to extrinsic evidence to interpret them." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc) (citing *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)). However, sometimes contract interpretation requires findings of fact, such as determining the parties' intent, to resolve ambiguous contract language. *See Perry-McCall Constr., Inc. v. United States*, 46 Fed. Cl. 664, 672 (2000) (citing *Sylvania Elec. Prods., Inc. v. United States*, 458 F.2d 994, 1005 (Ct. Cl. 1972)). "[B]ecause an ambiguous or uncertain writing sometimes can only be understood upon consideration of the surrounding circumstances, extrinsic evidence will be

allowed to interpret an ambiguous clause." *Burchick Constr. Co., Inc. v. United States*, 83 Fed. Cl. 12, 17 (2008) (citing *Cruz-Martinez v. Dep't of Homeland Sec.*, 410 F.3d 1366, 1371 (Fed. Cir. 2005)). Use of extrinsic evidence may only be used "to interpret an agreement in a manner that gives meaning to all its provisions. *Id.* (citing *McAbee*, 97 F.3d at 1434). If the court must hear extrinsic evidence regarding the intent of ambiguous contract terms, the dispute is not amenable to summary judgment. *See Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988) (citing S. Williston, *A Treatise on the Law of Contracts* § 616, 649, 652 (3d Ed. 1961)); *see also Cray Rsch., Inc. v. United States*, 41 Fed. Cl. 427, 439-40 (1998) (citing *Glob. Network Techs., Inc. v. Reg'l Airport Auth.*, 122 F.3d 661 (8th Cir. 1997)).

## III. DISCUSSION

In its motion for summary judgment, JKB argues that it is entitled to breach of contract damages due to the Army's failure to assign and pay for fourteen courses per ordering period. [ECF 80] at 25-26. The government cross-moves for summary judgment, contending that JKB is entitled only to termination costs under the constructive termination for convenience doctrine. [ECF 81] at 8. JKB rejects this argument, asserting that the Contract does not include an applicable termination for convenience clause, and that, even if one were applicable, the government cannot use it because the Army acted in bad faith and abused its discretion. [ECF 80] at 22. The Court finds that genuine issues of material fact preclude granting summary judgment on whether the Army breached the Contract, that the Contract contains a termination for convenience clause as necessary to invoke the constructive termination doctrine, and that genuine issues of material fact preclude summary judgment on whether the Army acted in bad faith or abused its discretion.

### A. Breach of Contract

JKB contends that the government breached the contract by "order[ing] fourteen [] classes per year from JKB" and by "fail[ing] to allow JKB to perform all the contracted-for . . . classes and continu[ing] to refuse to pay for the services which it purchased." [ECF 80] at 25. JKB further contends that the government conceded its breach by raising constructive termination because "governmental non-performance of the Contract is a pre-requisite for constructive termination for convenience." *Id.* at 21. The government states that the Court has not yet determined whether "the Army breached a duty to assign or pay JKB for 14 courses in the circumstances or that JKB's alleged damages were caused by that breach." [ECF 82] at 44. The government argues that "JKB cannot demonstrate that the Army had or breached a duty to assign JKB as many courses as it claims." [ECF 81] at 47.

In an earlier decision in this case, Judge Wheeler determined that the Contract contained a latent ambiguity as to how many classes were ordered by the Army, *JKB*, 148 Fed. Cl. at 96, and that "each party's interpretation of the provisions [of the contract and task orders were] problematic as a basis for summary judgment," *id.* at 99. The Court will not disturb this ruling. *See Arizona v. California*, 460 U.S. 605, 618 (1983) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case") (citing 1B J. Moore & T. Currier, ¶ 0.404 (1980)). Because the Contract contains a latent ambiguity, the Court must consider the surrounding circumstances to determine the parties'

7

intent. *See Burchick*, 83 Fed. Cl. at 17; *see Beta Sys.*, 838 F.2d at 1183. Therefore, the issue of whether the Army breached the Contract is not amenable to summary judgment.

Contrary to JKB's contention, the government has not conceded that it breached the contract by raising constructive termination in response to JKB's breach of contract claim. "[C]onstructive termination for convenience enables the government's actual breach of contract to be retroactively justified." *Maxima Corp. v. United States*, 847 F.2d 1549, 1553 (Fed. Cir. 1988)). The effect of constructive termination for convenience "is to moot all breach claims and to limit recovery to costs which would have been allowed had the contracting officer actually invoked the clause." *Kalvar Corp., Inc. v. United States*, 543 F.2d 1298, 1304 (Ct. Cl. 1976). Although the government argued, and continues to argue, that the Contract contains a termination for convenience clause and that its liability should be limited to termination for convenience costs under the constructive termination doctrine, it still contests JKB's allegations that the Army breached the Contract. *See* [ECF 81] at 44-47; [ECF 82] at 44-46. Thus, the government does not concede that the Army breached the Contract merely because it moved for summary judgment on whether its alleged breach of contract may be construed as a termination for the convenience. *See Clearmeadow Invs., LLC v. United States*, 87 Fed. Cl. 509, 529 (2009) (stating that "[p]rocedurally speaking, a party may concede a fact for purposes of its own summary judgment motion and yet reserve the right to litigate that fact should its motion be overruled"). If the facts ultimately show that the Army did not breach the Contract, JKB would not be entitled to any recovery. *See AT&T Commc'ns, Inc. v. Perry*, 296 F.3d 1307, 1314 (Fed. Cir. 2002) (holding that plaintiff is not entitled to restitution for breach of contract where there was no breach). Whether the Army breached the Contract must be resolved prior to determining whether the government may avoid liability under the constructive termination doctrine. *See Torncello v. United States*, 681 F.2d 756, 760 (Fed. Cir. 1982) (analyzing whether there was a breach of a requirements contract before reaching the issue of constructive termination).

### B.  Constructive Termination for Convenience

The constructive termination for convenience doctrine "is a legal fiction which imposes the standard limitations of the termination clause upon a plaintiff even though the termination was never actually ordered by the [CO]. The court in such a case proceeds as if the termination had in fact been ordered." *Kalvar*, 543 F.2d at 1306. For the government to assert constructive termination for convenience, the Contract must include an applicable termination for convenience clause. *See JKB*, 18 F.4th at 708 (stating that a CO "may only terminate a contract for the convenience of the government . . . if the contract has an applicable termination for convenience clause"); *see also Praecomm, Inc. v. United States*, 78 Fed. Cl. 5, 11 (2007).

The government argues that, even if it had breached the Contract by failing to provide JKB with fourteen classes per year, "the shortfall amounts to a constructive termination for convenience of each task order, because . . . the [g]overnment had the right to terminate the task orders for its sole convenience." [ECF 81] at 36. First, the government asserts that the Contract explicitly incorporates by reference, FAR 52.212-4, which applies to the procurement of commercial items and allows the government to terminate the Contract for its convenience. [ECF 81] at 30. FAR 52.212-4(l) states that "[t]he Government reserves the right to terminate this

contract, or any part hereof, for its sole convenience." Next, the government argues that, even if FAR 52.212-4 is not applicable, FAR 52.249-2, which provides convenience termination rights in fixed price contracts, is incorporated into the Contract by operation of law under the *Christian* doctrine. [ECF 81] at 34. FAR 52.249-2(a) states that "[t]he Government may terminate performance of work under this contract in whole or, from time to time, in part if the [CO] determines that a termination is in the Government's interest." The government thus argues that constructive termination "retroactively justif[ies] the government's actions, avoid[s] breach, and limit[s] liability." [ECF 81] at 36 (quoting *Praecomm*, 78 Fed. Cl. at 11) (alterations in original). JKB asserts that "constructive termination is not available to excuse the government's breach of its [C]ontract" because "[t]here is no applicable termination clause in this Contract." [ECF 80] at 29. The Court finds that FAR 52.212-4 is applicable to the Contract and that, even if FAR 52.212-4 is inapplicable, FAR 52.249-2 is applicable under the *Christian* doctrine.

> 1. *FAR 52.212-4 is Applicable Because the Contract is a Commercial Item Contract*

The government argues that FAR 52.212-4 is applicable because "the Contract is plainly a commercial items contract." [ECF 81] at 30. According to the government, this is obvious by the Contract's use of SF 1449—the commercial item contract form—and the inclusion of commercial item clauses. *Id.* JKB counters that "the Contract's [PWS] and the nature of the services provided show that the Contract is non-commercial regardless of the words printed on the government's boilerplate form." [ECF 83] at 23. JKB states: "[The] government's contention that the Contract is one for commercial items simply because it contains those words has been expressly rejected by the Federal Circuit [in *K-Con, Inc. v. Sec'y of the Army*, 908 F.3d 719 (Fed. Cir. 2018)]." *Id.*

In the instant case, the Federal Circuit held that FAR 52.212-4 "applies only to commercial item contracts" and that "it has no effect on the service contract between JKB [] and the government." *JKB*, 18 F.4th at 711. However, the Federal Circuit also noted that "[f]or the purposes of its summary judgment motion, the government does not dispute [JKB's] characterization of the contract as a service contract (and not a commercial item contract)." *Id.* at 710 n.2. Thus, the Federal Circuit did not consider whether the Contract is a commercial item contract, as the issue was not in dispute. Because this issue is now disputed, the Court must analyze and determine the contract type.

The "determination of the type of contract the parties entered into is generally a matter of law." *SSA Marine*, 77 Fed. Cl. at 665 (internal quotation marks omitted) (quoting *Crown Laundry & Dry Cleaners, Inc. v. United States*, 29 Fed. Cl. 506, 515 (1993)). When interpreting a contract, the Court begins with its plain language. *Hunt Constr. Grp., Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002) (citing *McAbee*, 97 F.3d at 1435). "[If] the contract language is unambiguous on its face, our inquiry ends, and the plain language of the contract controls." *Id.* at 1373 (citing *Textron Def. Sys. v. Widnall*, 143 F.3d 1465, 1469 (Fed. Cir. 1998)). "A contract is ambiguous only when it is susceptible to two reasonable interpretations." *Id.* (citing *A-Transp. Nw. Co., Inc. v. United States*, 36 F.3d 1576, 1584 (Fed. Cir. 1994)). "Ambiguities in a government contract are normally resolved against the drafter," but "[a]n exception to that general rule applies [] if the ambiguity is patent." *Triax Pac., Inc. v. West*, 130 F.3d 1469, 1474

9

(Fed. Cir. 1997) (citing *Interstate Gen. Gov't Contractors, Inc. v. Stone*, 980 F.2d 1433, 1434-35 (Fed. Cir. 1992)). This doctrine applies "only to contract ambiguities that are judged so 'patent and glaring' that it is unreasonable for a contractor not to discover and inquire about them." *Id.* (citing *Beacon Constr. Co. of Mass. v. United States*, 314 F.2d 501, 504 (Ct. Cl. 1997)). If an ambiguity is patent, the contractor has a duty to inquire about the ambiguity, "regardless of the reasonableness of the contractor's interpretation." *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed. Cir. 1985) (citing *Newsom v. United States*, 676 F.2d 647, 649-50 (Ct. Cl. 1982)). "[O]nly if a court finds that a patent ambiguity is not present does the court then inquire into the reasonableness of the contract interpretation." *Gaston & Assocs., Inc. v. United States*, 27 Fed. Cl. 243, 247 (1992) (citing *Mountain Home Contractors v. United States*, 425 F.2d 1260, 1263 (Ct. Cl. 1970)).

Here, the Contract is clearly a commercial item contract. To begin, the Contract is on SF 1449, which is the form used in solicitations and contracts for the acquisition of commercial items. *See* FAR 53.212 (2015). The form is titled: "SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEM." [ECF 65-2] at 1. Further, the Contract explicitly incorporates FAR 52.212-4 and FAR 52.212-5, which contain the contract terms and conditions applicable to commercial item acquisitions. *Id.* at 1, 27; *see* FAR 52.212-4 (2015); FAR 52.212-5 (2015). While not necessarily determinative, these features of the Contract are indications that it is one intended for commercial items. Next, the PWS describes the services to be performed as generic instructor services: "This is a non-personal services contract to provide instructor services." [ECF 65-2] at 12. It requires the contractor to "provide all instructors, transportation, supervision, and non-personal services necessary to perform instructor services." *Id.* Further, the PWS states that "[f]or each course assigned, the Contractor shall provide all instructional service to include: 1) Preparation, 2) Classroom Instruction, 3) Student Assessment, 4) Remediation, and 5) Course Administration." *Id.* Aside from stating that the instructors will augment the Army's faculty and use course materials developed by the Army, and that most of the students are Army personnel, the PWS does not contain any indication that the instructor services are unique to the government. *See id.*

Although the Court need not consider extrinsic evidence to determine that the Contract is plainly a commercial item contract, the extrinsic evidence is consistent with the Court's determination. *See Agility Pub. Warehousing Co. KSCP v. Mattis*, 852 F.3d 1370, 1381 (Fed. Cir. 2017); *Coast Fed. Bank*, 323 F.3d at 1040. Prior to issuing the solicitation, the Army determined that the instructor services it sought met the FAR definition of a commercial item under FAR 2.101.[3] [ECF 81-1] at 7. The Army "conducted market research . . . to determine if commercial items . . . [were] available that could meet the [Army's] requirements." *Id.* at 8. The Army surveyed the commercial market for "capable vendors to provide the required services" and for "commercial standards, practices, and procedures." *Id.* Ultimately, the Army determined that "[i]nstructor services are common both in the military and commercial market." *Id.*

---

[3] The Contract incorporates by reference FAR 52.212-4. [ECF 65-2] at 1. FAR 52.212-4(e) provides that "[t]he clause at FAR 52.202-1, Definitions, is incorporated herein by reference." FAR 52.202-1 states that "[w]hen a solicitation provision or contract clause uses a word or term that is defined in the [FAR], the word or term has the same meaning as the definition in FAR 2.101 in effect at the time the solicitation was issued." Thus, the FAR 2.101—the Definitions clause—is incorporated into the Contract, as it was in effect on May 29, 2015.

Therefore, it concluded that the instructor services "are a type of service offered and sold competitively in substantial quantities in the commercial marketplace" under FAR 2.101. *Id.*

To escape the government's constructive termination defense, JKB now argues that the CO made a "plainly incorrect determination of commerciality." [ECF 83] at 28. However, JKB waived this argument by not previously protesting or otherwise objecting to the solicitation as a commercial item acquisition. The solicitation was issued on May 29, 2015, as a commercial item acquisition, [ECF 65-1] at 1, and the Contract was awarded to JKB on September 9, 2015, [ECF 81-1] at 22. Thus, JKB had knowledge that the Army sought the instructor services as a commercial item acquisition and adequate time to challenge the commercial item designation. *See COMINT Systems Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012) (finding that "[t]here is no question that [the protester] could have challenged the solicitation before the award"). JKB could have objected to the commercial item designation, as well as the commercial item terms and conditions in the solicitation, prior to award. Because JKB failed to do so, it cannot raise this challenge now. *See id.* (holding that the protester "failed to preserve its challenge . . . by not raising the issue before the award of the contract"); *Inserso Corp. v. United States*, 961 F.3d 1343, 1352 (Fed. Cir. 2020) (stating that "[b]ecause a bidder . . . exercising reasonable and customary care would have been on notice of the now-alleged defect in the solicitation long before the awards were made, [the protester] forfeited its right to raise its challenge by waiting until awards were made").

JKB also characterizes the services as non-commercial, arguing that "the OCS course is purely military in nature" and that "the OCS course is not available whatsoever to the general public." [ECF 83] at 27. JKB further contends that it "taught classes exclusively to U.S. government personnel on military installations" and that "teaching these classes is not a service that could ever be offered in the commercial marketplace." *Id.* at 28. However, these arguments are misguided because they focus on the audience, location, and subject matter of the instructor services, instead of the services themselves. The Contract's objective was to acquire instructor services, not to acquire a type of instructor services used only in non-commercial applications. *See* [ECF 65-2] at 12 ("[t]his is a non-personal services contract to provide *instructor services*.") (emphasis added). That JKB provides instructor services exclusively to the government and performs such services on military installations does not make these services non-commercial or otherwise preclude a determination that the services are "of a type" offered and sold in the commercial marketplace, as determined by the CO. Further, while JKB argues that the OCS course "prepares Department of Defense personnel to perform military operations in contingency environments," [ECF 83] at 27, the content of the course is prepared by the Army, [ECF 65-2] at 12. The Contract did not require that JKB create or develop the OCS course, only that it provide instructors to teach it. *Id.* Additionally, the OCS course does not prepare students for combat or operation of military equipment, as JKB alludes. *See* [ECF 83] at 27 (stating that "the OCS course is purely military in nature" because it "prepares Department of Defense personnel to perform military operations in contingency environments"); [ECF 85] at 21 (analogizing "teaching military pilots to conduct bombing missions over hostile territory flying advanced fighter jets" with providing civilians with "flying lessons in a Cessna"). Instead, it instructs students on contract administration and management requirements "in support of contingency operations." [ECF 65-2] at 12.

Moreover, the Federal Circuit's decision in *K-Con* does not support JKB's contention that the Contract is a non-commercial contract. In *K-Con*, the contractor argued that the contracts at issue were commercial item contracts, as opposed to construction contracts, to avoid mandatory bonding requirements. 908 F.3d 719. The Federal Circuit determined that the contracts were patently ambiguous and, thus, the contractor could not "now argue that the contracts [were] for commercial items." *Id.* at 723. In reaching this decision, the Federal Circuit explained: "[I]f the contracts had been issued using the standard construction contract form, they would have been construction contracts without any ambiguity. But that is not what happened here. Instead, these contracts issued using the standard commercial items contract form." *Id.* In addition to noting that the contracts issued using the standard commercial items contract form, the Federal Circuit noted that the contracts contained "many indications that the contracts were for construction, not commercial items," including references to construction services in the CLIN descriptions and statement of work as well as requirements to comply with FAR regulations applicable to construction contracts. *Id.* Consequently, the Federal Circuit found that "the use of the commercial items solicitation[] form and the construction-related terms of the contracts themselves were facially inconsistent indications that would have placed a reasonable contractor on notice that the contracts are patently ambiguous." *Id.*

In this case, the Contract does not contain any "facially inconsistent indications" that the Contract is a non-commercial contract. To the contrary, the Contract states that it is a commercial items contract, and it contains the FAR clauses applicable to commercial items. The Court is not persuaded by JKB's argument that the Contract "clearly contains a mismatch between its boilerplate 'commercial items' standard form[] and the [PWS] and the actual course of dealing." [ECF 83] at 28. Even if the Court were to accept JKB's argument that the Contract is non-commercial based on the PWS and nature of its services, *id.* at 23, this would result in a patent ambiguity, which the Court would construe against JKB. *See Triax Pac.*, 130 F.3d at 1475 (stating that "[a]mbiguities in a government contract are normally resolved against the drafter," but "[a]n exception to that general rule applies [] if the ambiguity is patent."). Such a reading would result in a glaring disconnect between the use of the commercial items form and clauses and the services described in the PWS. Due to this "plainly apparent [] inconsistency," [ECF 83] at 31, JKB would have a duty to inquire about the ambiguity, "regardless of the reasonableness" of its interpretation, *Fortec Constructors*, 760 F.2d at 1291. As a result of JKB's failure to inquire, the government's interpretation of the Contract would prevail. *See K-Con*, 908 F.3d at 723. Thus, JKB cannot now argue that the Contract is non-commercial. Because the Contract is a commercial item contract, the termination clause found in FAR 52.212-4 is applicable, and the government may use the termination for convenience clause under FAR 52.212-4(l) to support its constructive termination defense.

### 2. FAR 52.249-2 is Applicable Under the Christian Doctrine

Even if FAR 52.212-4 did not apply, FAR 52.249-2 (Termination for Convenience of the Government (Fixed Price)) would apply. JKB characterizes the Contract as a "non-commercial, ID/IQ service contract." [ECF 80] at 42 (emphasis removed). Although JKB recognizes that "the FAR [] contain[s] several regulations concerning termination for convenience in service contract[s,]" *id.*, JKB asserts that "those clauses explicitly apply only to fixed price service contracts, not to ID/IQ service contracts like the one here," *id.* (emphasis removed). The

government contends that "[t]he contract at issue here contains firm-fixed price CLINs," and thus, FAR 52.249-2 must be inserted into the Contract by operation of law. [ECF 81] at 34.

Under the *Christian* doctrine, "a court may insert a clause into a government contract by operation of law if that clause is required under applicable federal administrative regulations." *K-Con*, 908 F.3d at 724 (citing *Gen. Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 779 (Fed. Cir. 1993)). To read a clause into a contract by operation of law, the Court "generally must find (1) that the clause is mandatory; and (2) that it expresses a significant or deeply ingrained strand of public procurement policy." *Id.* (citing *Gen. Eng'g*, 991 F.2d at 779). Because *Christian* held that the termination of a contract for the government's convenience is part of "a deeply ingrained strand of public procurement policy," the Court must only determine whether the termination for convenience clause is mandatory for the Contract. *See G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 426 (Ct. Cl. 1963) (stating that the history of the termination clause shows that "the Defense Department and the Congress would be loath to sanction a large contract which did not provide for power to terminate"); *see also Mktg. & Mgmt. Info., Inc. v. United States*, 57 Fed. Cl. 665, 674 (2003) (stating that "[t]he termination for convenience clause is such a 'deeply ingrained strand of public procurement policy.'") (quoting *Christian*, 312 F.2d at 426).

The Court finds that FAR 52.249-2 is mandatory. The FAR requires insertion of FAR 52.249-2 "[a]s prescribed in 49.502(b)(1)(i)." FAR 52.249-2 (2013). FAR 49.502(b)(1)(i) provides that "[t]he contracting officer shall insert the clause at 52.249–2, Termination for Convenience of the Government (Fixed–Price), in solicitations and contracts when a fixed-price contract is contemplated and the contract amount is expected to exceed the simplified acquisition threshold." In this case, the Contract's ceiling price is $1,072,594. [ECF 65-2] at 4. Because this amount exceeds the simplified acquisition threshold of $150,000, *see* FAR 2.101 (2015), inclusion of FAR 52.249-2 by operation of law hinges on whether the Army contemplated a fixed price contract.

The Army clearly contemplated a fixed price contract type for the instructor services. The Contract explicitly states that it is a firm-fixed price contract. *See* [ECF 65-2] at 4 ("Type of Contract 1: Firm Fixed price"). It further states that "Task Orders will be issued on a Firm Fixed Price . . . basis for services against the contract," and the contract type assigned to the CLINs for the instructor services is listed as "Firm Fixed Price." *Id.* at 4-10. Additionally, the Contract incorporates FAR 52.246-4, "Inspection of Services - - *Fixed-Price*." *Id.* at 19 (emphasis added). This clause is required to be inserted into contracts for services "when a fixed-price contract is contemplated" as prescribed by FAR 46.304. Thus, the plain language of the Contract shows that the Army contemplated a firm fixed price contract.[4] Because the Contract is a fixed price

---

[4] The Army also incorporated a cost reimbursement contract type into the Contract. *See* [ECF 65-2] at 4 ("Type of Contract 2: Cost no Fee"). This contract type applies only to required travel for performance of the instructor services. *Id.* ("Cost Reimbursement (no fee for travel)). The incorporation of a cost reimbursement contract type for travel only does not affect the determination that the Contract is a fixed price contract for instructor services. Under the FAR, a contract may be multiple types. *See* FAR 16.104(e) (2011) (providing for combining contract types, and "[i]f the entire contract cannot be firm-fixed price, the [CO] shall consider whether or not a portion of the contract can be established on a firm-fixed price basis."); *see also* John Cibinic, Jr., et al., *Formation of Government Contracts* 12-5 (5th ed. 2023) ("[Contracts under FAR Parts 16 and 17] fall into two broad categories—contracts that describe the pricing arrangement agreed to by the parties and contracts that call for the performance of variable quantities of the work to be determined during performance. These latter types of contracts can have one or more

13

contract, if the Contract were to be treated as a non-commercial contract, the Court would read FAR 52.249-2, Termination for Convenience of the Government (Fixed Price), into the Contract by operation of law. *See Christian*, 312 F.2d at 427 (stating that "it is both fitting and legally sound to read the termination article required by the Procurement Regulations as necessarily applicable to the present contract and therefore as incorporated into it by operation of law").

The Court is not persuaded by JKB's assertion that this clause does not apply to IDIQ service contracts and that there is "no clause in the FAR mandating (or even allowing) a termination clause in this non-commercial, *ID/IQ service* contract." [ECF 80] at 42 (emphasis in original). JKB's argument focuses on the fact that the Contract is an IDIQ contract and ignores that it is also a fixed price, services contract. [ECF 65-2] at 4 ("Type of Contract 1: Firm Fixed Price" and "Kind of Contract: Service Contracts"). While JKB is correct that the FAR does not prescribe a termination for convenience clause applicable to IDIQ contracts, this characteristic is not relevant to the determination of whether the FAR mandates insertion of a termination for convenience clause into the Contract. For the purposes of prescribing termination for convenience clauses, the FAR looks to the contract pricing arrangement and object of the procurement. *See* FAR 49.502(a)-(d) (2007). Here, because the Contract is a firm fixed price contract for services that exceeds the simplified acquisition threshold, the FAR mandates insertion of 52.249-2, Termination for Convenience of the Government (Fixed–Price). FAR 49.502(b)(1)(i) (2007).

### C. Bad Faith or Abuse of Discretion

Even though the Court finds that there is an applicable termination for convenience clause in the Contract, the Court must also determine whether the Army acted in bad faith or abused its discretion to resolve whether constructive termination for convenience is available to the government in the event of a breach. JKB asserts that even if there was an applicable termination for convenience clause in the Contract, "constructive termination would not be available here because the Contracting Officer acted with bad faith and/or abused her discretion." [ECF 80] at 35. JKB argues that the Army acted in bad faith because it "reallocat[ed] classes away from JKB in favor of its own instructors which it did not have to pay." *Id.* at 38. JKB also contends that the CO abdicated her responsibility and thus abused her discretion by having the Course Director ("CD") and COR "unilaterally reduce the number of classes the Army had purchased." *Id.* at 41. The government asserts that JKB cannot demonstrate bad faith because JKB cannot prove that the Army had a "specific intent" to injure JKB or that the Army's actions were "motivated by malice." [ECF 81] at 37 (quoting *Am-Pro Protective Agency v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002)) (internal quotation marks omitted). The government further argues that "JKB cannot demonstrate that a constructive termination for convenience is barred by the CO's purported delegation of authority in abuse of her discretion – because this is not the action claimed to be a breach." [ECF 82] at 43. The government posits that the claimed breach is the non-assignment of classes and, to avoid the government's right to a constructive termination for convenience, JKB must show that such non-assignment was an abuse of discretion. *Id.*

---

pricing arrangement."). The FAR states that "[i]ndefinite-delivery contracts may provide for any appropriate cost or pricing arrangement under [FAR Part 16]." FAR 16.501-2(c) (2014).

"[T]he government may not resort to the doctrine of constructive termination for convenience if it 'evinced bad faith or a clear abuse of discretion in its actions.'" *JKB*, 18 F.4th at 709 (quoting *Kalvar*, 543 F.2d at 1300-01). When determining bad faith, the court begins with the presumption "that the government acts in good faith when contracting." *Id.* (citing *Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed. Cir. 1995)). "Showing [that] a government official acted in bad faith is intended to be very difficult." *Am-Pro*, 281 F.3d at 1240. To overcome the presumption of good faith, a plaintiff must show clear and convincing evidence that the government official acted in bad faith with specific intent to injure the contractor. *See id.* at 1240-41; *see also Kalvar*, 543 F.2d at 1302 (stating that "the necessary [] proof has been equated with evidence of some specific intent to injure the plaintiff.") (internal quotation marks omitted).

"[I]n order to be an abuse of discretion, the decision must be found to be arbitrary and capricious." *U.S. Fid. & Guar. Co. v. United States*, 676 F.2d 622, 630 (Ct. Cl. 1982). "[A] showing that there was clearly no reasonable basis for the official action would be enough" to demonstrate an abuse of discretion. *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1204-05 (Ct. Cl. 1974), *abrogated on other grounds by Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1331-33 (Fed. Cir. 2001). Where the government seeks to invoke the constructive termination for convenience doctrine, the government must have had a reasonable basis for its actions. *See Krygoski Constr. Co., Inc. v. United States*, 94 F.3d 1537, 1544-45 (Fed. Cir. 1996); *see also Maxima*, 847 F.2d at 1552 (stating that "[t]he courts have held that a governmental breach of contract may be construed as a termination for the convenience of the government when changed circumstances justify the reallocation of risk to the contractor"). "Termination for convenience, whether actual or constructive, is not of unlimited availability to the government, [and] it is not an open license to dishonor contractual obligations." *Maxima*, 847 F.2d at 1553 (citing *Torncello*, 681 F.2d at 770, 772); *see also Ace-Fed. Reps., Inc. v. Barram*, 226 F.3d 1329, 1333-34 (Fed. Cir. 2000). A boundless termination for convenience right would be "a route of complete escape [that] vitiates any other consideration furnished and is incompatible with the existence of a contract." *Torncello*, 681 F.2d at 769.

The Court finds that there are genuine issues of material fact that preclude summary judgment on whether the Army acted in bad faith or abused its discretion by not assigning classes to JKB. The parties dispute how the United States Army Training and Doctrine Command ("TRADOC") assigned classes to ALU. *See* [ECF 81] ¶¶ 50-52; [ECF 83] ¶¶ 50-52. The parties further dispute the ALU scheduling process based on the scheduled courses from TRADOC and unscheduled courses from the Training Resource Arbitration Panel process. [ECF 81] ¶¶ 53-58; [ECF 83] ¶¶ 53-58. More generally, the parties dispute the circumstances that resulted in the Army assigning less than fourteen courses to JKB per ordering period. *See* [ECF 81] ¶¶ 59-111; [ECF 83] ¶¶ 59-111.

To appropriately evaluate the Army's conduct, it is necessary to understand the facts surrounding the Army's scheduling and assignment of courses. If it is determined that the Army was required under each task order to assign fourteen classes to JKB and failed to do so without a reasonable basis, this would constitute an abuse of discretion. *See Krygoski*, 94 F.3d at 1544 (stating that, because a particular task increased from 10% to 50% of the contract price, this

15

change in circumstances was "a reasonable basis for terminating the contract for the Government's convenience."); *Nesbitt v. United States*, 345 F.2d 583, 585 (Ct. Cl. 1965) (stating that "[a] party to a contract may 'justify an asserted termination, rescission, or repudiation, of a contract by proving that there was, at the time, an adequate cause, although it did not become known to him until later') (quoting *Coll. Point Boat Corp. v. United States*, 267 U.S. 12, 16 (1925)). If the Army issued each task order intending to purchase fourteen classes from JKB while knowing that it would not assign the classes to JKB and that it would instead use its own instructors to meet its requirements, this would constitute bad faith. *See JKB*, 18 F.4th at 709 (stating that "[t]he government acts in bad faith when, for example, it 'contracts with a party knowing full well that it will not honor the contract'") (quoting *Caldwell*, 55 F.3d at 1582). In both circumstances, the government would not be able to resort to the constructive termination for convenience doctrine to avoid liability for breach of contract.

## IV.     CONCLUSION

For the reasons set forth above, genuine issues of material fact preclude summary judgment on whether the Army breached the Contract and, if so, whether the Army's conduct constituted bad faith or an abuse of discretion such that constructive termination for convenience is unavailable. The Court needs to weigh the evidence, make credibility determinations, and draw legitimate inferences from the facts. Accordingly, JKB's motion for partial summary judgment is **DENIED**. [ECF 80]. The government's motion for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**. [ECF 81]. The Court **GRANTS** summary judgment on the following issues: (i) that the Contract is a commercial items contract, (ii) that the termination for convenience clause under FAR 52.212-4 is applicable to the Contract, and (iii) that, alternatively, FAR 52.249-2, Termination for Convenience of the Government (Fixed Price), is applicable under the *Christian* doctrine. The Court **DENIES** summary judgment with respect to the government's remaining arguments.

The parties **SHALL FILE** a joint status report **on or before March 29, 2024**, proposing further proceedings for this case.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge
